UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONNECTICUT FUND FOR THE ENVIRONMENT, INC., d/b/a SAVE THE SOUND, SOUNDKEEPER, INC., PECONIC BAYKEEPER, GROUP FOR THE EAST END, RUTH ANN BRAMSON, JOHN POTTER, JOHN TURNER,<br><br>              Plaintiffs,<br><br>          v.<br><br>UINITED STATES GENERAL SERVICES ADMINISTRATION, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, DENISE TURNER ROTH, in her official capacity as ADMINISTRATOR OF THE U.S. GENERAL SERVICES ADMINISTRATION, and JEH JOHNSON, in his official capacity as SECRETARY OF THE U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>              Defendants. | Case No. __16cv03791__<br><br>**COMPLAINT FOR**<br>**DECLARATORY AND**<br>**INJUNCTIVE RELIEF** |

Plaintiffs Save the Sound, a program of Connecticut Fund for the Environment ("Save the Sound"), Soundkeeper, Inc. ("Soundkeeper"), Peconic Baykeeper, Group for the East End, Ruth Ann Bramson, John Potter, and John Turner (collectively the "Plaintiffs") bring this action for declaratory and injunctive relief following the failure of the U.S. General Services Administration ("GSA") and the U.S Department of Homeland Security ("DHS") (collectively the "Joint Lead Agencies" or "Defendants") to comply with the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.* ("NEPA"), the Endangered Species Act, 16 U.S.C. 1531, *et seq.* ("ESA"), the Consolidated Security, Disaster, Assistance and Continuing Appropriations Act of 2009, Pub. L. No. 110-329, ("Appropriations Act"), the Consolidated Appropriations Act of

1

2012, Pub. L. No. 112-74, and the Coastal Zone Management Act, 16 U.S.C. 1451, *et seq.* ("CZMA"), in recommending the unconditional sale of Plum Island.

## INTRODUCTION

1.      Plum Island, a small island off the coast of Long Island, New York, has been owned by the federal government since 1826.  First operated as a coastal artillery post, from 1954 to the present it has been a research facility for animal diseases.  Because of these federal research facility operations, access to Plum Island has been extremely limited, with human activity on the 840-acre island largely restricted to approximately 170 acres.

2.      The remaining 670 acres has naturally developed into a unique and extraordinary de facto nature preserve that is home to several federal endangered species, has a critical ecological link to Long Island Sound and the marine species that inhabit it, and serves as habitat for over 200 species of birds.  Plum Island's undisturbed habitat includes 196 acres of upland forest, 96 acres of freshwater wetlands, and 101 acres of a beach/dune system.

3.      In January 2009, however, the DHS decided to relocate its animal disease research facilities, known as the Plum Island Animal Disease Center ("PIADC") to Manhattan, Kansas, and prepared to sell Plum Island.  In preparation for this relocation, Defendant prepared an Environmental Impact Statement ("EIS") for the sale of the PIADC and Plum Island, and ultimately issued its final decision to move forward with an unfettered sale of the island to the highest bidder in a Record of Decision ("ROD").

4.      The EIS process was fundamentally flawed in at least six ways.  First, Defendants misconstrued their statutory directive, interpreting their authority to only permit a public auction of the entirety of Plum Island to the highest bidder, thereby necessarily excluding a conservation sale from their alternatives analysis.  Second, Defendants violated NEPA by failing to consider

2

important government interests and programs in arriving at its decision, such as the protection of federally-listed and state-listed endangered and threatened species, compliance with New York and Connecticut coastal consistency determinations, and the adverse economic impacts of a potential sale of Plum Island.  Third, Defendants violated NEPA by failing to adequately consider alternatives to a public auction to the highest bidder, such as a bifurcated sale of discrete parcels or a single unitary sale with conservation easements attached to the property or conservation of those parts not supporting the PIADC operations, even though such alternatives were repeatedly suggested to them.  Fourth, Defendants violated NEPA by failing to consult with and rely upon the expertise of the appropriate federal agencies with respect to endangered species, coastal zone and environmental cleanup.  Fifth, Defendants violated NEPA and the CZMA by failing to engage in consistency determinations with the appropriate state agencies. Sixth, Defendants violated NEPA by basing their decision on inadequate ecological data and failed to detail how they would clean up contamination associated with the PIADC.

5.      Defendants issued this EIS notwithstanding the fact that they were made aware of each of these flaws through repeated comments from state agencies, other federal agencies and non-profit organizations.

6.      Defendants' ill-considered decision to sell Plum Island, and the fundamentally-flawed EIS supporting that decision, threaten the continued existence of the endangered species that inhabit Plum Island, the ecology of the Long Island Sound, and violate numerous Federal laws.

7.      In light of these violations, Plaintiffs respectfully request that this Court invalidate Defendants' decision to sell the entirety of Plum Island at public auction, as well as the EIS and ROD supporting that decision, and enjoin the Defendants from selling Plum Island.

ny-1212161

## THE PARTIES

8.      Plaintiff Connecticut Fund for the Environment, Inc. ("CFE") d/b/a Save the Sound is a 501(c)(3) not-for-profit corporation founded in 1978 and incorporated under the laws of the State of Connecticut, with principal place of business at 142 Temple Street, Suite 305, New Haven, CT 06510, and a New York office located at 545 Tompkins Avenue, 3rd Floor, Mamaroneck, NY 10543.

9.      Save the Sound was formed in 1972 as the Long Island Sound Taskforce to Preserve and Protect the Sound.  In 2004, Save the Sound merged with, and is now a program of, CFE.  CFE is registered to do business in Connecticut and New York State as Save the Sound.

10.      Save the Sound's primary purpose is to conserve and enhance the biological integrity of Connecticut's and New York's air, land, and water resources, including Long Island Sound, its shores and its islands. Save the Sound's primary strategic goal is to protect and support wildlife, recreation and clean water in critical natural areas by, among other measures, (1) protecting our last, great open spaces from over-development, (2) preserving important coastal and island habitats, (3) ensuring that all residents are able to access and enjoy the Sound, and (4) preserving natural dunes and marshes to help protect shoreline communities from future storms and sea level rise.

11.      Save the Sound uses legal and scientific expertise, advocacy, and education in furtherance of its purpose to achieve results that benefit the environment for current and future generations.

12.      Save the Sound represents approximately 3,500 member households, many of whom use and enjoy Long Island Sound, its shores, and its islands—including Plum Island. Many of Save the Sound's members live on or near Long Island Sound, and enjoy, or recreate in

these waters, including but not limited to commercial or recreational fishing and boating, swimming, and other recreational and commercial activity.  Save the Sound's members share a common concern about the quality of Long Island Sound, the surrounding waters and shores, and the wildlife that depends on both.

13.    Plaintiff Soundkeeper, Inc. ("Soundkeeper") is a member-supported, not-for-profit organization, formed under the laws of the State of Connecticut, with its principal place of business at 7 Edgewater Place, Norwalk, CT 06855.  Soundkeeper was founded in 1987 by the shellfishing and fisheries communities to combat the progressive pollution and destruction of habitat in the Sound.  Soundkeeper is dedicated to the protection and enhancement of the biological, physical, and chemical integrity of Long Island Sound and its watershed. Soundkeeper's members use and enjoy the waters of Long Island Sound to fish, recreationally and commercially, sail, boat, kayak, swim, birdwatch, photograph, view wildlife and engage in nature study and scientific study, among other activities.  Many of Soundkeeper's members live on or near the Long Island Sound.

14.    Plaintiff Peconic Baykeeper is a 501(c)(3) not-for-profit organization with its principal place of business at 10 Old Country Road, Quogue, NY 11959.  Peconic Baykeeper was founded in 1998 and is dedicated to conserving, protecting and restoring the Peconic Bay Estuary. Peconic Baykeeper works actively with civic groups, baymen, businesses, children, and the community at large to protect and restore water quality and Long Island's watershed ecosystems.  Peconic Baykeeper's members live and work in the area around the Peconic Estuary.  The sustainability of local watersheds like the Peconic Estuary depends in large part on the health of surrounding watersheds, like those surrounding Plum Island.

15.     Plaintiff Group for the East End (the "Group") is a professionally staffed, member-supported, not-for-profit conservation advocacy and education organization formed under the laws of the State of New York, with its principal place of business at 54895 Main Road, Southold, New York 11971.  Group for the East End was founded in 1972 by a diverse community of regional stakeholders including local residents, seasonal residents, farmers and baymen in response to an onslaught of development that threatened to destroy Eastern Long Island's rich natural and cultural heritage, as well as its local economy, which depends on the environmental health and renowned scenic beauty of the region.  The Group's mission is to protect and restore the natural resources of Eastern Long Island and instill a conservation ethic in all those who visit and reside there.  Its members live in the five easternmost towns of Long Island and frequently use the waters of the eastern Long Island Sound as well as the Peconic and Gardiner's Bays to fish (both recreationally and commercially), sail, boat, kayak, swim, birdwatch, photograph, paint, view wildlife and engage in natural and scientific study, among other activities.  Group for the East End offers hundreds of classroom and field learning programs annually, both for the general public and the region's school districts, focused on instilling ecological principals through direct contact with the region's rich coastal environments.

16.     Plaintiff Ruth Ann Bramson is a member of Save the Sound and resides in the Town of Southold, New York.  Six generations of her family have lived on the North Fork of Long Island, owning homes there continuously since 1921.  She first visited Plum Island in 2008, and since then has organized community tours of the island.  During her visits, her tour groups observe and appreciate the wildlife and woodlands of Plum Island.  She has delivered at least twenty lectures regarding the history of Plum Island, including the history of its natural resources

and wildlife.  Plaintiff Bramson was the lead-author of *A World Unto Itself: The Remarkable History of Plum Island, New York*, which tracks the four-hundred years of Plum Island's history.

17.    Plaintiff John Potter is a member of Save the Sound and the President of the Connecticut/Rhode Island Coastal Fly Fishers and resides in Groton, Connecticut.  As an avid salt-water fly fisherman, he spends a significant amount of time fishing in the waters surrounding Plum Island, including Plum Gut on the western end and Sluice Way on the eastern end.  These areas are considered destination fisheries to salt-water fly fisherman like John Potter and other members of the Connecticut/Rhode Island Coastal Fly Fishers.

18.    Plaintiff John Turner is a member of Save the Sound and resides in Massapequa Park, New York.  He is an environmental professional holding leadership positions at various government and environmental organizations, and has worked to safeguard Long Island's natural resources, water quality, wildlife, and coastal habitats.  He is also a natural historian and author of a 270-page guide to Long Island's natural resources entitled "Exploring the Other Island:  A Seasonal Nature Guide to Long Island."  He has led several programs dedicated to the natural and cultural history of Plum Island.  On a number of occasions he has birded on the waters surrounding and on Plum Island.  He enjoys observing the hundreds of harbor and gray seals that form the largest seal haul-out site in southern New England.

19.    Defendant United States General Services Administration ("GSA") is an administrative agency of the United States Government responsible for the procurement and sale of federal facilities and real estate.  DHS acted as a joint lead agency in the decision to sell Plum Island.

20.    Defendant U.S. Department of Homeland Security ("DHS") is an administrative agency of the United States Government responsible for protecting the United States from

ny-1212161

terrorism and other threats, as well as securing and managing the borders of the United States. DHS is currently responsible for the safety and security of Plum Island and acted as a joint lead agency in the decision to sell Plum Island.

21.    Defendant Denise Turner Roth is the Administrator of GSA and in that capacity has final responsibility for actions taken by GSA.  Ms. Turner Roth is sued in her official capacity.

22.    Defendant Jeh Johnson is the Secretary of DHS and in that capacity has final responsibility for actions taken by DHS.  Mr. Johnson is sued in his official capacity.

## STANDING

23.    Plaintiffs' members live, work, and/or recreate in the communities and waters of Long Island Sound, including those surrounding Plum Island.

24.    Among the activities that Plaintiffs' members engage in are: (a) sailing and boating around Plum Island; (b) bird-watching, including participation in bird-count activities on Plum Island; (c) fishing in the waters adjacent to Plum Island; (d) marine life watching, particularly seal and whale watching; and (e) studying the environmental and structural history of the grounds and buildings on Plum Island.  All of these activities will be adversely impacted by the proposed sale and anticipated development of Plum Island.

25.    Given the deep appreciation of its members, Save the Sound and its members have a direct interest in the preservation of Plum Island.

26.    Save the Sound members have participated in conservation-based land purchases and have given money to support conservation-based land purchases.  Its members have participated in fund-raising campaigns which have raised hundreds-of-thousands of dollars to preserve ecological and historical landmarks.  If there was a conservation sale of Plum Island,

Save the Sound members would provide both monetary and non-monetary support for such a purchase.

27.     Save the Sound members also regularly visit national parks and conserved lands and their vicinity to sail and boat, watch birds, including participating in bird counts, fish, watch marine life such as whales and seals, and study and appreciate architectural and historical structures and areas.  If the option to preserve all or part of the island as a state or federal park were studied and adopted in full or in part, Save the Sound members would be able to engage in some or all of these activities in and around Plum Island.

28.     Additionally, Save the Sound and its members have been actively involved in providing public input during the Scoping Process and preparation of the Draft Environmental Impact Statement ("DEIS") and the Final Environmental Impact Statement ("FEIS").  They filed extensive comments on the proposed sale and the Environmental Impact Statements issued by GSA and DHS, in addition to testifying at formal hearings, identifying data gaps and alternative scenarios that should have been evaluated pursuant to the requirements of NEPA, the APA, and the Appropriations Act.

29.     While Plaintiffs would have considered working on a strategy towards a potential purchase of Plum Island in order to preserve this unique ecosystem, Defendants have foreclosed that option by misconstruing its legislative directive for a public sale to require an online auction to the highest bidder, rather than a full consideration of all available alternatives.

30.     The lack of conservation alternatives will directly harm Ruth Ann Bramson's ability to appreciate Plum Island's uninhabited stretches of sandy beaches, hundreds of species or birds, seals, and other wildlife.  Beyond the destruction of the island as a habitat for endangered species, the only access road to Plum Island runs directly past her home in Long Island.  If the

9

entirety of Plum Island is sold to developers, the resulting increase in traffic would harm her and her family's quality of life.

31.   The lack of conservation alternatives will directly harm Group for the East End's ability to continue offering educational programs that rely heavily on the use of the local environment as a living laboratory for students as well as deprive the Group's members of a significant source of recreational, aesthetic, and commercial enjoyment and satisfaction.

32.   The lack of conservation alternatives will directly harm Peconic Baykeeper's ability to protect and enjoy local watersheds like the Peconic Estuary from the pollution and degradation that would flow from the development of Plum Island.  Peconic Baykeeper's members would be deprived of a significant source of enjoyment and satisfaction.

33.   The lack of conservation alternatives will directly harm John Turner's ability to appreciate the birds, seals, and other wildlife that occupy Plum Island.  He would be deprived of a significant source of enjoyment and satisfaction.

34.   The lack of conservation alternatives will directly harm John Potter's ability to fish in the waters surrounding Plum Island.  The development of Plum Island—and attendant pollution and traffic—would harm the fisheries surrounding Plum Island, depriving John Potter of a significant source of personal enjoyment and satisfaction.

35.   The aesthetic, conservation, recreational, economic, scientific, informational, and procedural interests of Plaintiffs and their respective members have been, are being, and, unless the relief prayed for herein is granted, will continue to be adversely affected and irreparably injured by Defendants' failure to comply with federal law as described below.

ny-1212161

## JURISDICTION AND VENUE

36.    This Court has original subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 in that this is a civil action involving claims arising under the laws of the United States.

37.    Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1391(e) in that the property that is the subject of this action is located in this district and a substantial portion of the events or omissions giving rise to this action occurred in this district.

## PLUM ISLAND

38.    Plum Island is an 840-acre island located approximately 1.5 miles off the northeast tip of Orient Point, Long Island, New York. The island is cradled by Long Island Sound and Peconic Bay, both of which are federally-designated National Estuaries.

39.    Plum Island is the former home of the U.S. Army's Fort Terry, which was established as a coastal artillery post in 1897 and utilized through World War II.  In 1954, Plum Island was transferred to the U.S. Department of Agriculture ("USDA") to establish a research facility for foot-and-mouth disease. In 2003, it was transferred to the DHS, which now oversees the safety and security of Plum Island facility operations, while the USDA continues to use the Plum Island Animal Disease Center ("PIADC").  The PIADC is comprised of buildings, industrial facilities and equipment, roadways, utilities, a water treatment plant, and specialized facilities.  The DHS also owns and operates transportation assets and a 9.5-acre facility to support PIADC at Orient Point, New York, which includes buildings, utilities, and ferry docking facilities.

ny-1212161

40.    The total developed and maintained area of Plum Island comprises approximately 170 acres.  Human activity on Plum Island has largely been restricted to these 170 acres.  This includes 35 acres associated with the PIADC and its transportation and support facilities and approximately 30 acres associated with the former Fort Terry.

41.    Due to the nature of the PIADC's mission, access to Plum Island has been limited and highly regulated.  This relative isolation and lack of human disturbance has allowed the resident flora and fauna to develop unmolested.  As such, the vast undeveloped portion of the island has been left largely in its natural state.

42.    Plum Island's undisturbed habitat includes 196 acres of upland forest, 96 acres of freshwater wetlands, and 101 acres of a beach/dune system.

## FEDERAL RECOGNITION OF PLUM ISLAND'S ECOLOGICAL VALUE

43.    In 2006, Plum Island was designated a Long Island Sound Stewardship site by the Long Island Sound Study, under the authority of the federal Clean Water Act, indicating a strong governmental and public interest in the conservation of the undeveloped natural resources of the island.

44.    The Stewardship Initiative Atlas identifies Plum Island as "exemplary colonial waterbird habitat, including sites that are of national – if not international – significance."  (Long Island Sound Stewardship Initative, *2006 Stewardship Atlas*, http://library.rpa.org/pdf/Long-Island-Sound-Stewardship-Initiative-Atlas.pdf, at 38  (last accessed February 22, 2016).)

45.    Plum Island has also been recognized as an important coastal resource pursuant to the Coastal Barrier Resources Act, 16 U.S.C. 3501, *et seq*, and is included within the Coastal Barrier Resources System.

ny-1212161

46.     Based on its designation as a Coastal Barrier Resource Area, certain restrictions apply to Federal expenditures in relation to Plum Island.  In particular, no new expenditures or financial assistance may be made available under Federal law for any purpose, including the construction of any structures or facilities, with limited exceptions.  *See* 16 U.S.C. § 3504.

47.     The ecological value of Plum Island's habitats and natural diversity was further acknowledged when the United States Fish and Wildlife Service ("USFWS") designated Plum Island as one of the Northeast Coastal Areas Study Significant Coastal Habitat sites.  This designation identifies Plum Island as a habitat and area of natural diversity in need of protection in southern New England.

48.     The National Oceanic and Atmospheric Administration ("NOAA"), through its National Marine Fisheries Service ("NMFS") program, has designated the Long Island Sound— which surrounds the northern, eastern and southern shores of Plum Island—as an "Essential Fish Habitat" for at least 45 species.

## PLUM ISLAND'S PLANTS, WILDLIFE, BIRD AND MARINE SPECIES

49.     Plum Island is home to a diverse array of plants and wildlife, many of which are classified as endangered and threatened species.

50.     Plum Island contains one of the highest concentrations of rare plants—fourteen to twenty varieties—in New York, including several federally endangered and threatened species, such as sandplain gerardia, seabeach knotweed, seabeach amaranth, and small whorled pogonia.

51.     Over 217 species of birds have been identified on Plum Island.  This includes Roseate Terns, a federally endangered species that use the island for courting, raising their fledglings, foraging, and stopovers, and Piping Plovers, a federally threatened species that also use the shoreline habitat for breeding and foraging.  Both species are susceptible to human

disturbance of their habitat, which adversely impacts both breeding and feeding success, as well as the survival rate of chicks.

52.     Plum Island has been designated as critical bird habitat by Audubon New York's Important Bird Area Designation Program.  It also hosts fifty-seven of New York State's species of greatest conservation need, as designated by the New York Department of Environmental Conservation ("NYDEC"), including osprey, American oystercatcher, Northern harrier, and common eider.  Seven active osprey nests and an active colony of bank swallow, a declining bird species in New York, were identified in 2009.  Several hundred common terns, a New York State threatened species, also make use of the island.

53.     There are a number of federally listed or endangered marine species present in the waters surrounding Plum Island.  These include Atlantic hawksbill sea turtle, Atlantic (Kemp's) Ridley sea turtle, green sea turtle, leatherback sea turtle, loggerhead sea turtle, and the Atlantic sturgeon.

54.     NYDEC has designated the waters of Long Island Sound as critical habitat for the federally endangered Kemp's Ridley sea turtle.

55.     Several other species, many of which are endangered, are also known to frequent the waters surrounding Plum Island, including but not limited to humpback whale, beluga whale, the federally endangered North Atlantic right whale and bottlenose dolphins.

56.     Plum Island and its surrounding waters are used extensively by harbor and grey seals, and the island is one of the most important seal haul-out areas in southern New England.

## THE PROPOSED SALE OF PLUM ISLAND

57.     On September 30, 2008, the U.S. Congress passed Public Law 110-329, the "Consolidated Security, Disaster Assistance and Continuing Appropriations Act, 2009," which

ny-1212161

among other provisions, directed the sale of the "real and related personal property and transportation assets which support Plum Island operations, subject to such terms and conditions as necessary to protect government interests and meet program requirements," if it should be determined that the PIADC should be moved to a new location.  Pub. L. No. 110-329.

58.      By its plain terms, the Appropriations Act limited any public sale to the property "which support Plum Island operations."  Pub. L. No. 110-329

59.      Similarly, the Appropriations Act expressly required that any sale be "subject to such terms and conditions as necessary to protect government interests and meet program requirements."  Pub. L. No. 110-329

60.      In January 2009, the DHS made a determination to construct and operate a new National Bio and Agro-Defense Facility ("NBAF") in Manhattan, Kansas, and to move the current operations from the PIADC at Plum Island to the NBAF in Kansas.

## THE NEPA PROCESS

61.      Pursuant to NEPA, all federal agencies are required to prepare a detailed statement in advance of major Federal actions significantly affecting the quality of the human environment.  This statement must include:  (i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.  *See* 40 C.F.R. 1502.16.

62.      This detailed statement is known as an environmental impact statement or EIS.

63.     Pursuant to 40 C.F.R. § 1502.14, the EIS must consider alternatives to the proposed action.  NEPA requires that lead agencies: (a) rigorously explore and objectively evaluate all reasonable alternatives and, for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated; (b) devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits; (c) include reasonable alternatives not within the jurisdiction of the lead agency; (d) include the alternative of no action; (e) identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference; and (f) include appropriate mitigation measures not already included in the proposed action or alternatives.

64.     As 40 C.F.R. § 1502.14 states:  "This section is the heart of the environmental impact statement."

65.     An EIS must also include an analysis on "the environmental impacts of the alternatives including the proposed action" and "any adverse environmental effects which cannot be avoided should the proposal be implemented."  40 C.F.R. § 1502.16.

66.     NEPA's implementing regulations provide that a lead agency (or lead agencies) supervise the preparation of an EIS.  *See* 40 C.F.R. § 1501.5.

67.     GSA and DHS acted as joint lead agencies in preparing the EIS with regards to the sale of Plum Island.

68.     NEPA's implementing regulations also provide lead agencies the ability to request that other federal agencies with either jurisdiction by law or "special expertise" regarding specific environmental issues act as cooperating agencies in preparation of the EIS.  40 C.F.R. §

16

ny-1212161

1501.6.  The U.S. Environmental Protection Agency ("EPA") and the U.S. Fish and Wildlife

Service ("USFWS"), acted as cooperating agencies in the preparation of the EIS for the sale of

Plum Island.

69.    Pursuant to 40 C.F.R. § 1501.6(a)(2), the lead agencies shall "[u]se the

environmental analysis and proposals of cooperating agencies with jurisdiction by law or special

expertise, to the maximum extent possible consistent with its responsibility as lead agency."

## COMMENTS DURING THE SCOPING PERIOD

70.    As part of the preparation of the EIS, NEPA requires that Lead Agencies conduct

"an early and open process for determining the scope of issues to be addressed and for

identifying the significant issues related to a proposed action."  40 C.F.R. § 1501.7.  This process

is known as "scoping."

71.    Defendants initiated the public scoping process by publishing a notice of intent in

the Federal Register on March 18, 2010.

72.    Public Scoping Meetings were held to determine the scope of the proposed EIS on

May 19, 2010 in Old Saybrook, Connecticut, and on May 20, 2010 in Greenport, New York.

73.    Throughout the scoping period, a number of federal, state, and local government

agencies and departments, including the EPA and USFWS as cooperating agencies, Governor

Rell of Connecticut, the NYDEC, the Connecticut Department of Energy and Environmental

Protection ("CTDEEP"),  the Long Island Sound Study Citizens Advisory Council, and Plaintiff

Save the Sound offered specific comments on important government interests to be taken into

account when considering the final disposition of Plum Island.

74.    The important government interests specifically highlighted for Defendants

included: (i) the protection of federally-listed and state-listed endangered and threatened species

of flora and fauna (including the roseate tern, piping plover, common loon, common tern, osprey, northern harrier, red-shouldered hawk, Cooper's hawk, sharp-shinned hawk, northern goshawk, peregrine falcon, shortnose sturgeon, northern right whale, Atlantic hawksbill sea turtle, green sea turtle, Atlantic (Kemp's) Ridley sea turtle, leatherback sea turtle, loggerhead sea turtle, sandplain gerardia, seabeach amaranth, small whorled pogonia, hop sedge, coastal sedge and spring ladies' tresses); (ii) the importance of Plum Island as a Long Island Sound Stewardship site under the Long Island Sound Stewardship Act; (iii) the value of Plum Island to many species of migratory birds, as recognized under the Migratory Bird Treaty Act; (iv) the importance of Plum Island under the Coastal Barriers Resources Act; (v) the importance of Plum Island to the protection of marine mammals (including whales, dolphins and seals) on and in the waters surrounding Plum Island pursuant to the Marine Mammals Protection Act; (vi) compliance with New York and Connecticut coastal consistency determinations (pursuant to the Connecticut Coastal Management Act and the New York State Coastal Management Program); (vii) the value of Fort Terry and the Plum Island Lighthouse as important historic sites pursuant to the National Historic Preservation Act and the National Historic Lighthouse Preservation Act; and (viii) the adverse economic impacts of a potential sale of Plum Island.

75.    Governor Rell of Connecticut, in a June 1, 2010 letter to GSA, noted "there appear to be far too many unknowns that both limit [Connecticut's] ability to provide comments through this scoping process and forestall an accurate and complete assessment of the impacts and consequences the sale of Plum Island will have on the residents of Connecticut and our region's natural resources."  (Governor M. Jodi Rell, *Comments on the Proposed Sale of Plum Island*, at 2 (June 1, 2010).)  She further stressed the importance of additional studies with regard

to the wildlife of Plum Island, particularly the endangered species on and around the island.  *See id.* at 5-6.

76.     Governor Rell additionally warned that "to sell the island in its entirety to a single purchaser . . . would limit the pool of potential purchasers and would likely price Plum Island out of the reach of entities who would want to acquire it for conservation purposes."  *Id.*at 8.  Governor Rell suggested alternatives to a wholesale auction of the entirety of Plum Island, such as "offering for private sale only the portion(s) of the island presently developed and occupied (approximately 10%), while preserving the remaining, undeveloped acreage as natural habitat."  *Id.*

77.     The EPA stressed the need for further evaluation of "the ecological importance of this property through an inventory and assessment of its natural resource values and ecological functions" and recommended separate sales in order to permanently protect the undeveloped portion of Plum Island.  (Judith A. Enck, *Comments to the EIS*, U.S. Envt'l Prot. Agency, at 2 (June 2, 2010).)

78.     In a June 16, 2010 letter, USFWS, a cooperating agency, urged GSA "[to] undertake a detailed analysis of the impacts of its proposed action on the significant fish and wildlife resources and habitats that are found on and adjacent to Plum Island," particularly threatened and endangered species.  (David A. Stilwell, *Comment on the GSA's Notice to Prepare an EIS*, U.S. Dep't of the Interior, at 1 (June 16, 2010).)  USFWS also recommended that GSA include a conservation oriented, public ownership option in its EIS.  *Id.*

79.     Additionally, on March 31, 2010, CTDEEP informed Defendants that Plum Island's proximity to Connecticut and its maritime connection to Connecticut's shoreline communities, subjected the proposed sale to federal consistency review under the CZMA to

ensure compliance with Connecticut's Coastal Management Program.  (David J. Fox, *CTDEEP Comment on the Proposed Sale of Plum Island,* CTDEEP (August 1, 2013).)

80.    Non-profit organizations such as Audubon Connecticut specifically urged Defendants to conduct comprehensive ecological studies of Plum Island, including: "a complete ecological survey of the flora and fauna of the property,"  "[a] thorough inventory and assessment of the wildlife, biological and ecological functions, and potential restoration opportunities on the island and associated marine environment," "[a] comprehensive analysis of the level of appropriate public uses and development that could feasibly be supported by the island, while protecting critical environmental resources," and "[a]n economic analysis of the benefits of wildlife-related tourism and recreation."  (Alexandra Breslin, *Comments to the EIS Public Scoping Process for the Proposed Sale of Plum Island*, Audubon Connecticut, at 1-3 (June 2, 2010).

81.    In a June 2, 2010 letter, Plaintiff Save the Sound proposed additional ecological surveys, separate sales of the developed portion and undeveloped portions of Plum Island, and highlighted the government interests that Defendants should have considered under the Appropriations Act.  (Curtis P. Johnson, *Scoping Comments regarding the EIS of a proposed Sale of Plum Island*, Connecticut Fund for the Environment (June 2, 2010).)

82.    Following public scoping, but prior to publication of the DEIS, the USFWS, a cooperating agency, expressed concern with the process by which Defendants were preparing the EIS.  In an October 19, 2010 letter, the USFWS stated:  "we feel that the anticipated time-frames and the scope of analysis that have been provided to us thus far are inappropriately rushed and narrow.  We believe that a fully considered alternative, which must be included in the EIS, is to have the island utilized as a wildlife refuge or sanctuary, without an increase in development or

intensification of human use above the current levels."  (David A. Stilwell, *Comment on the GSA's Notice to Prepare an EIS*, U.S. Dep't of the Interior, at 1 (October 19, 2010).)

## CONSULTATION UNDER THE ESA

83.     Pursuant to Section 7 of the ESA, a federal agency must initiate formal consultation with the NMFS (which has jurisdiction over marine species) or USFWS (which has jurisdiction over terrestrial and freshwater species) whenever it undertakes an "action" that "may affect" a listed species or critical habitat.

84.     On March 30, 2010, Defendant GSA notified USFWS and NMFS of their intention to conduct an EIS in connection with its intended sale of Plum Island by competitive auction.  The GSA invited both the USFWS and NMFS to comment on the proposed auction.

85.     In a letter dated June 16, 2010, the USFWS responded to the GSA and noted the presence of several federally endangered species on and around Plum Island, including Piping Plovers, Kemp's Ridley sea turtles, as well as "other Federally-protected sea turtle species." (David A. Stilwell, *Comment on the GSA's Notice to Prepare an EIS*, U.S. Dep't of the Interior (June 16, 2010).)

86.     The NMFS also informed Defendants of the existence of other endangered and threatened species on and around Plum Island, including green and leatherback sea turtles, loggerhead turtles, Northern right whales, and humpback whales.  (Mary A. Colligan, *Comment Re: Sale of Plum Island, Orient Point, NY*, NMFS (April 12, 2010.))  The NMFS specifically noted that a formal consultation pursuant to Section 7 of the ESA would be necessary "if GSA determines that the proposed sale may affect listed species."  *Id.* at 3.

## COMMENTS TO THE DEIS

87.    Following the public scoping sessions, on July 20, 2012, Defendants, as Joint Lead Agencies, issued the DEIS.  Written and oral comments on the DEIS were accepted until October 26, 2012.

88.    While the Appropriations Act limited a public sale to that "real and related personal property and transportation assets which support Plum Island operations," Pub. L. No. 110-329, the DEIS proposed a sale of all 840 acres of Plum Island and the entire 9.5 acre parcel in Orient Point, New York.  (*See* July 13, 2012 DEIS, ES-1.)

89.    The DEIS did not consider transferring parts of the island that did not support the PIADC to the federal government and did not consider disposing of parts of the island through a public conservation sale.

90.    While the Appropriations Act expressly required that any public sale be "subject to such terms and conditions as necessary to protect government interests and meet program requirements," Pub. L. No. 110-329, the DEIS failed to meaningfully consider numerous government interests and program requirements, including, but not limited to, conservation, endangered species protection, coastal zone management, environmental cleanup and historic preservation.  (*See* July 13, 2012 DEIS.)

91.    While the DEIS referenced a single conservation/preservation option, it did not consider it as an option to be pursued by Defendants, instead it was referenced as a potential course of action that might ultimately be taken by a private party after an auction of the entire site to the highest bidder.  (*Id.* At ES-5-6.)

92.    The DEIS ignored the reality that any conservation organization could not compete in an auction to the highest bidder for the entirety of Plum Island and Orient Point Facility.

93.    The DEIS did not consider any conservation easements or other restrictions on development at the time of sale that would protect the natural resources of Plum Island and the government interest in protecting those natural resources.  (*See* July 13, 2012 DEIS.)

94.    Following the issuance of the DEIS, Defendants received more than one-hundred additional comments, including comments from federal, state, and local governmental agencies, as well as private citizens and non-profit organizations, urging Defendants to collect more natural resources data and to consider alternatives that would promote conservation of Plum Island's valuable natural resources.

95.    For example, the Department of the Interior, noted its "incomplete understanding of all the resources that utilize the island due to a lack of surveys or environmental studies" and that "[m]any fish and wildlife populations on Plum Island have not been thoroughly inventoried."  (Andrew Raddant, *Comments on DEIS for the Public Sale of PIADC*, U.S. Dep't of the Interior, at 3-4 (October 26, 2012).)

96.    The Department of the Interior also informed Defendants that "indirect effects of residential development [at the anticipated densities] would likely create a measurable adverse impact to listed species resulting from human recreational disturbance and shoreline management activities."  *Id.*  It stated that because "the FEIS indicates that residential development would be likely to adversely affect listed species . . . formal Section 7 consultation would be necessary."  *Id.*

97.    In a September 18, 2012 letter, NYDEC criticized the DEIS' failure to adequately take into account Plum Island's wildlife.  For example, the letter noted that the DEIS "makes a very tenuous assumption that the use of the property under private ownership would be sufficiently similar to the existing use as to result in no adverse impacts or even an improvement to the biological resources in the vicinity."  (Sherri Aicher, *Comments on the DEIS for the Public Sale of Plum Island*, NYDEC (September 18, 2012).)  The letter notes that surveys were not conducted to inventory Plum Island's herpitiles and bats, the latter of which "have become one of the greatest conservation concerns in the northeast U.S."  *Id.*

98.    George Jepsen, Attorney General of the State of Connecticut, commented:  "The DEIS is deficient and should be revised."  (George Jepsen, *Comments of the Attorney General of the State of Connecticut*, at 1 (October 26, 2012).  Attorney General Jepsen criticized the DEIS for failing to conduct "a thorough review and careful evaluation of the impacts of a sale and subsequent development on the environment," and further noted that "the hypothetical development scenarios which may result from an unrestricted sale of Plum Island present troubling unknowns and the potential for incalculable and unacceptable detrimental impact to Plum Island as well as Long Island Sound."  *Id.* at 1, 7-8.

99.    In a September 25, 2012 letter, the Long Island Sound Study commented:  "the Plum Island DEIS has not considered all available information describing the ecological significance of Plum Island in its description of the 'affected environment.'  Therefore, the DEIS does not fully evaluate the potential impacts of the proposed sale of the property under any of the alternative property reuse scenarios."  (Georgia Basso and David Kozak, *DEIS for Public Sale of Plum Island*, Long Island Sound Study (September 25, 2012).)

24

100.    On October 9, 2012, CTDEEP reiterated its position that the proposed sale was subject to review for consistency with the state's Coastal Management Plan and directed that Defendants "must prepare and submit to [the Office of Long Island Sound Programs] a Federal Consistency Determination identifying reasonably foreseeable direct and/or indirect effects on Connecticut's coastal resources and uses." (David J. Fox, *CTDEEP Comment on the Sale of Plum Island*, CTDEEP, at 2 (October 9, 2012).)

101.    The New York Department of State ("NYDOS") also advised Defendants of the need for any proposed action to comply with the coastal consistency determination of the CZMA and the availability of alternatives to the unfettered sale of the entirety of Plum Island.  (FEIS C-182.)

102.    On October 26, 2012, the NYDOS informed Defendants that early coordination would be necessary to ensure compliance with the requirements of the CZMA.  *Id.*  Additionally, the NYDOS directed that any consistency determination conducted as part of the EIS should be included as a separate section in the Final EIS and comply with the timing requirements of the CZMA.  *Id.*

103.    The NYDOS noted the limited references in the DEIS to potential impacts on New York's coastal resources, and stated that a "thorough analysis" of the impacts of the proposed sale on all of New York's coastal policies was necessary.  *Id.*

104.    Additionally, the EPA, as cooperating agency, raised several concerns with the DEIS' failure to address "the clean-up process as it relates to the research facility and potential biological contamination."  (Judith A. Enck and H. Curtis Spalding, *Comment on DEIS*, Environmental Protection Agency, at 5 (October 9, 2012).)  The EPA stated:  "there is a lack of detailed information pertaining to contamination associated with the historic uses of the island,

including military activities and biological research." *Id.* The EPA "rated the DEIS 'EC-2-Environmental Concerns-Insufficient Information' in accordance with the EPA's national rating system." *Id.* EPA offered specific guidance for how Defendants could remedy the deficient DEIS: "The FEIS should detail the specific components of the clean-up, what each component will achieve, and how the process will ensure the safety of future potential inhabitants of the island." *Id.* The EPA even offered to assist Defendants in addressing these concerns: "As a cooperating agency for this project, EPA staff remain available to the extent our resources allow to help GSA as it works to respond to issues raised in our comments." *Id.*

105.    In addition to comments from state and federal agencies, several non-profit groups with extensive conservation expertise, including Save the Sound, The Nature Conservancy, Audubon New York and Audubon Connecticut, recommended that detailed biological surveys should be taken to better inform the environmental impacts analysis required by NEPA.

106.    In an October 18, 2012 letter to the GSA, The Nature Conservancy stated: "[t]he DEIS lacks and the Nature Conservancy and other members of the Preserve Plum Island Coalition have called for a four-season biological survey of the island's flora and fauna by on-site field biologists in order to make informed decisions about the natural resources and potential impacts to them from various future uses. To date such an inventory has not been undertaken by the federal owners or their consultants, nor have the owners of the island permitted field work to be performed by outside entities." (Randall Parsons, *Draft EIS for the Sale of Plum Island*, The Nature Conservancy, at 5 (October 18, 2012).)

## THE FEIS

107.    Defendants, as Joint Lead Agencies, issued the FEIS on June 25, 2013.

108.    While the Appropriations Act limited a public sale to that "real and related personal property and transportation assets which support Plum Island operations," Pub. L. No. 110-329, the FEIS, like the DEIS, proposed a sale of all 840 acres of Plum Island and the entire 9.5 acre parcel in Orient Point, New York.  (*See* June 25, 2013 FEIS, ES-1.)

109.    The FEIS did not consider transferring parts of the island that did not support the PIADC to the federal government and did not consider disposing of parts of the island through a public conservation sale.

110.    While the Appropriations Act expressly required that any public sale be "subject to such terms and conditions as necessary to protect government interests and meet program requirements," Pub. L. No. 110-329, the FEIS, like the DEIS, failed to meaningfully consider numerous government interests and program requirements, including, but not limited to, conservation, endangered species protection, coastal zone management, environmental cleanup and historic preservation.  (*See* June 25, 2013 FEIS.)

111.    The FEIS failed to address comments that it was based on insufficient ecological data, including studies regarding contamination.  For example, in a September 30, 2013 letter, Governor Cuomo of New York wrote that:  "The final EIS acknowledges that questions concerning possible contamination identified by DEC have never been fully investigated but fails to provide any details about when or even whether these issues will be resolved."  (Governor Andrew Cuomo, *Sale of Plum Island*, Executive Chamber, State of New York, at 1 (September 30, 2013).)  Governor Cuomo noted that "during inspections in 2011, DEC staff determined that PIADC is not properly managing solid waste and determined that PIADC's quality control procedures and testing procedures for laboratory waste . . . are deficient . . . ,  creat[ing] an unacceptable risk for the exposure during transportation off the island . . . ."  *Id.* at 2.

112.    While the FEIS, like the DEIS, referenced a single conservation/preservation option, it did not consider it as an option to be pursued by Defendants, instead it was referenced as a potential course of action that might ultimately be taken by a private party after an auction of the entire site to the highest bidder.  (*See* June 25, 2013 FEIS at ES-3-4.)

113.    The FEIS, like the DEIS, did not consider any conservation easements or other restrictions on development that would protect the natural resources of Plum Island and the government interest in protecting those natural resources.  (*See* June 25, 2013 FEIS.)

114.    The FEIS ignored the EPA's request that "[t]he FEIS should detail the specific components of the clean-up, what each component will achieve, and how the process will ensure the safety of future potential inhabitants of the island."  (Judith A. Enck and H. Curtis Spalding, *Comment on DEIS*,  Environmental Protection Agency, at 5 (October 9, 2012).)

115.    In response to the FEIS, Defendants received additional comments from state and federal agencies, as well as interested stakeholders such as Plaintiffs and other non-profits which underscored the continued deficiencies in the EIS process.

116.    For example, in an August 5, 2013 letter, the EPA commented that the FEIS failed to consider "an ordinance that would create a conservation area that would limit development and preserve much of the island," and failed to "offer mitigation options as EPA recommended in our comment letter on the DEIS."  (Judith A. Enck, *Comments to the FEIS*, U.S. Envt'l Prot. Agency, at 1-3 (August 5, 2013).)  The EPA noted that Defendants had ignored its previous request to "include a detailed explanation of the clean-up process as it relates to the research facility and potential biological contamination including a discussion of the components of the clean-up, what each component will achieve, and how the process will ensure the safety of future potential inhabitants of the island."  *Id.* at *2.  Ultimately, the EPA concluded that "the

FEIS is not significantly enhanced from the DEIS and does not provide a sufficiently detailed evaluation of the potential impacts of the sale of Plum Island." *Id*. at 3.

117.    The Preserve Plum Island Coalition highlighted the comments to the DEIS that the FEIS failed to address, including:  the failure to consider a sale of only portions of the entire island, the failure to conduct a four-season ecological inventory, failure to provide current information on the number of bird species on the island, and the failure to evaluate potential adverse impacts to wetlands areas.  (John L. Turner, *Comments on the FEIS for the Public Sale of Plum Island*, Preserve Plum Island Coalition (August 3, 2013).)

118.    Many groups and government agencies highlighted the fact that the manner of the proposed sale would limit opportunities for conservation groups to participate.

119.    For example, in an August 5, 2013 Letter, the Trust for Public Land noted:   "As a non-profit conservation organization that identifies opportunities for land conservation, we are concerned that the process of selling Plum Island by public auction, particularly if GSA moves forward with an outright, full sale of the entire island, may exclude interested conservation groups and organizations that may wish to protect and preserve the island or parts for the general public."  (Mark Matsil, *Plum Island, New York*, Trust for Public Land, at 1 (August 5, 2013).)

120.    Similarly, CTDEEP noted:  "The Department continues to believe that sale of the island as a single parcel would limit the pool of potential purchasers and price the island out of the reach of entities who would want to acquire portions of it for conservation purposes.  In contrast, acquisition of sensitive portions of the island for conservation would guarantee protection of its natural resources in perpetuity and not rely on subsequent regulatory mechanisms."  (David J. Fox, *CTDEEP Comment on the FEIS*, CTDEEP, at 1 (August 1, 2013).)

121.    The CT DEEP further noted that "[i]t is appropriate that a federal action of separate sales of development parcels and significant natural areas be employed to ensure continued protection of these critical biological and natural resources.  Multiple sales would also comply with the mandate for sale specified in the Consolidated Security, Disaster Assistance and Continuing Appropriations Act."  (*Id.* at 1-2)

## THE RECORD OF DECISION

122.    Two months after issuing the FEIS, Defendants, as Joint Lead Agencies, issued their ROD on August 29, 2013.

123.    The ROD memorialized Defendants' decision to proceed with a public sale of the entirety of Plum Island, as well as the Orient Point assets, notwithstanding the extensive comments they received regarding the deficiencies of the FEIS, and their failure to respond to comments to the DEIS.  (*See* August 29, 2013 ROD, at *1.)

124.    While the Appropriations Act limited a public sale to that "real and related personal property and transportation assets which support Plum Island operations," Pub. L. No. 110-329, the ROD proposed a sale of all 840 acres of Plum Island and the entire 9.5 acre parcel in Orient Point, New York.  (*See* August 29, 2013 ROD, at *1.)

125.    The ROD did not consider transferring parts of the island that did not support the PIADC to the federal government and did not consider disposing of parts of the island through a public conservation sale.

126.    While the Appropriations Act expressly required that any public sale be "subject to such terms and conditions as necessary to protect government interests and meet program requirements," Pub. L. No. 110-329, the ROD failed to meaningfully consider numerous government interests and program requirements, including, but not limited to, conservation,

endangered species protection, coastal zone management, environmental cleanup and historic preservation.  (*See* August 29, 2013 ROD.)

127.    While the ROD referenced a single conservation/preservation option, it did not consider it as an option to be pursued by Defendants, instead it was referenced as a potential course of action that might ultimately be taken by a private party after an auction of the entire site to the highest bidder.  (*See Id.* at *1.)

128.    The ROD did not consider any conservation easements or other restrictions on development that would protect the natural resources of Plum Island and the government interest in protecting those natural resources.  (*See* August 29, 2013 ROD.)

129.    The ROD did not address the EPA's repeated requests that Defendants specifically detail their plans for cleaning up potential contamination associated with the PIADC, even though the EPA was a cooperating agency.

130.    The ROD did not address the USFWS' request that Defendants include a conservation-oriented, public ownership option, even though the EPA was a cooperating agency.

131.    While the ROD recognized "the flora, fauna, and marine resources" as well as the "historic properties" on Plum Island, the ROD determined that the impact of development on these ecological and historical resources would be "minor to moderate."  (August 29, 2013 ROD at *3-4.)

132.    This determination was based on incomplete and inadequate ecological surveys, and no studies regarding the potential for contamination.

133.    Further, underscoring the lack of critical analysis regarding potential environmental impacts, the ROD failed to discuss or identify any environmentally preferable alternatives to the proposed action.

## FIRST CAUSE OF ACTION

**Violation of NEPA, Appropriations Act, and APA for failure to adequately consider conservation or a bifurcated sale**

134.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 131 as if fully set forth herein.

135.    The Appropriations Act authorizes the "public sale [of] all real and related personal property and transportation assets which support Plum Island operations, subject to such terms and conditions as necessary to protect government interests and meet program requirements." Pub. L. No. 110-329

136.    Notwithstanding the Appropriations Act's explicit restriction of any sale to "[that] real and related personal property and transportation assets which support [the] Plum Island operations," *id.*, Defendants interpreted the Act to require a public sale of all 840 acres of Plum Island and 9.5 acres of the Orient Point New York facility.

137.    Properly read, this restriction would limit the sale to only those assets that directly support the PIADC, such as the PIADC facility, as well as the adjoining structures and transportation infrastructure necessary to carry out the mission of the PIADC.

138.    Instead, while only 170 acres of Plum Island have been utilized to support the Plum Island operations, Defendants interpreted the Act to require the sale of an additional 680 acres of land that currently is either (1) undeveloped and unimproved, (2) associated with the Fort Terry historic site, or (3) associated with the Plum Island lighthouse.

139.    By misconstruing the Appropriations Act, Defendants violated NEPA by failing to conduct an adequate analysis of reasonable alternatives.

140.    An adequate analysis of reasonable alternatives would include a bifurcated sale or conservation of that portion of the property not directly related to PIADC operations.

141.    Defendants were made aware of such an alternative through public comments before they issued the FEIS.

142.    Defendants failure to adequately consider reasonable alternatives was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the Administrative Procedure Act, 5 U.S.C. § 706 and contrary to the statutory authority conveyed by the Appropriations Act, in violation of 5 U.S.C § 706(2)(C).

143.    As a direct result of Defendants failure to consider reasonable alternatives, Plaintiffs will suffer immediate and actual harm.

144.    In particular, the sale of Plum Island as proposed by Defendants will foreclose the ability of Plaintiffs and others to participate in the purchase of all or part of Plum Island for conservation purposes or to otherwise conserve the land and natural resources and adversely affect and irreparably harm the Plaintiffs and their respective members' aesthetic, conservation, recreational, economic, scientific, informational, and procedural interests.

## SECOND CAUSE OF ACTION

**Violation of NEPA, Appropriations Act, and APA for failure to adequately consider government interests and programs**

145.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 131 as if fully set forth herein.

146.    The Appropriations Act authorizes the "public sale [of] all real and related personal property and transportation assets which support Plum Island operations, subject to such

terms and conditions as necessary to protect government interests and meet program requirements." Pub. L. No. 110-329.

147.    Notwithstanding the Appropriations Act's explicit requirement that any sale be "subject to such terms and conditions as necessary to protect government interests," *id.*, Defendants failed to consider numerous government interests and program requirements in their proposed sale.

148.    Throughout the EIS process, public and private agencies and entities at the local, state, and federal level identified a number of government interests that would be implicated by the sale of Plum Island and recommended specific measures to protect those interests.

149.    Those government interests included the protection of threatened and endangered species pursuant to the ESA, minimizing the damage to fish, wildlife, and other natural resources associated with coastal barriers pursuant to the Coastal Barriers Resource Act, preserving the nation's historic resources pursuant to the National Historic Preservation Act and National Historic Lighthouse Preservation Act, and minimizing the degradation of wetlands pursuant to the Long Island Sound Stewardship Initiative and the CZMA.

150.    Defendants, through their DEIS, FEIS, and ROD, provided absolutely no analysis of how their proposed sale would impact the important government interests expressed in these Federal statutes and highlighted by public comment.

151.    Defendants' failure to consider these government interests, as required by the Appropriations Act, resulted in their failure to consider reasonable alternatives as required by NEPA.

152.    Defendants' refusal to consider relevant government interests was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the

34

Administrative Procedure Act, 5 U.S.C. § 706 and contrary to the statutory authority conveyed by the Appropriations Act, in violation of 5 U.S.C § 706(2)(C).

153.    As a direct result of Defendants failure to consider government interests, Plaintiffs will suffer immediate and actual harm.

154.    In particular, the sale of Plum Island as proposed by Defendants will foreclose the ability of Plaintiffs and others to participate in the purchase of all or part of Plum Island for conservation purposes or to otherwise conserve the land and natural resources and adversely affect and irreparably harm the Plaintiffs and their respective members' aesthetic, conservation, recreational, economic, scientific, informational, and procedural interests.

## THIRD CAUSE OF ACTION

**Violation of NEPA, Appropriations Act, and APA for failure to adequately consider alternatives to an auction sale**

155.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 131 as if fully set forth herein.

156.    The Appropriations Act authorizes the "public sale [of] all real and related personal property and transportation assets which support Plum Island operations, subject to such terms and conditions as necessary to protect government interests and meet program requirements."  Pub. L. No. 110-329.

157.    While "public sale" is not defined in the Appropriations Act, Defendants misconstrued "public sale" to mean public auction to the highest bidder.

158.    Despite numerous and repeated comments urging Defendants to consider alternatives to an auction, they failed to acknowledge any reasonable alternative to a public auction to the highest bidder.

ny-1212161

159.     Defendants refused to consider any of the feasible and practical alternatives suggested to them, such as a sale or transfer of all or part of Plum Island to another agency such as USFWS pursuant to the Federal Land Policy and Management Act of 1976 or Transfer of Certain Real Property for Wildlife Conservation Purposes Act of 1948, a bifurcated process involving multiple sales of discrete parcels that would accommodate both commercial and conservation purchasers, or a single unitary sale with conservation easements attached to the property.

160.     Defendants' interpretation of public sale to preclude any sale other than a public auction to the highest bidder necessarily excluded any potential conservation purchasers.

161.     By narrowly and erroneously construing the term public sale, Defendants predetermined the outcome of the EIS process to exclude reasonable conservation alternatives.

162.     Defendants' refusal to consider reasonable alternatives was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the Administrative Procedure Act, 5 U.S.C. § 706 and contrary to the statutory authority conveyed by the Appropriations Act, in violation of 5 U.S.C § 706(2)(C).

163.     As a direct result of Defendants failure to consider reasonable alternatives, Plaintiffs will suffer immediate and actual harm.

164.     In particular, the sale of Plum Island as proposed by Defendants will foreclose the ability of Plaintiffs and others to participate in the purchase of all or part of Plum Island for conservation purposes or to otherwise conserve the land and natural resources and adversely affect and irreparably harm the Plaintiffs and their respective members' aesthetic, conservation, recreational, economic, scientific, informational, and procedural interests.

36

## FOURTH CAUSE OF ACTION

**Violation of NEPA and APA for failure to adequately specify any alternatives considered to be environmentally preferable**

165.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 131 as if fully set forth herein.

166.    Under NEPA, 40 CFR § 1505.2(b), an agency must specify in its Record of Decision any alternatives considered to be environmentally preferable.

167.    Notwithstanding the many comments Defendants received proposing reasonable alternatives that were environmentally preferable to a public auction of the entirety of Plum Island to the highest bidder, Defendants failed to specify a single alternative that was considered to be environmentally preferable to their proposed sale.

168.    Defendants' failure to specify a single reasonable alternative was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the Administrative Procedure Act, 5 U.S.C. § 706 and contrary to the statutory authority conveyed by the Appropriations Act, in violation of 5 U.S.C § 706(2)(C).

169.    As a direct result of Defendants failure to specify reasonable alternatives, Plaintiffs will suffer immediate and actual harm.

170.    In particular, the sale of Plum Island as proposed by Defendants will foreclose the ability of Plaintiffs and others to participate in the purchase of all or part of Plum Island for conservation purposes or to otherwise conserve the land and natural resources and adversely affect and irreparably harm the Plaintiffs and their respective members' aesthetic, conservation, recreational, economic, scientific, informational, and procedural interests.

ny-1212161

## FIFTH CAUSE OF ACTION

**Violation of NEPA, APA, and ESA for failure to formally consult under the ESA**

171.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 131 as if fully set forth herein.

172.     Pursuant to the ESA, 50 CFR § 402.14(a), a federal agency must initiate a formal consultation with the NMFS or USFWS whenever it undertakes an "action" that "may affect" a listed species or critical habitat.

173.     Further, in the event that the NMFS and USFWS do not concur with an agency's determination that the proposed action is "not likely to adversely affect" a listed species or critical habitat, the agencies must engage in "formal consultation."

174.     The USFWS, among many other commenters, expressly informed Defendants, on multiple occasions, that their proposed action would have an adverse effect on federally endangered and threatened species.

175.     In response, instead of engaging in formal consultation as required by Section 7 of the ESA, Defendants completed the FEIS and ROD and ignored the USFWS' recommendations entirely.

176.     Defendants failure to engage in formal consultation as required by Section 7 of the ESA and to incorporate the guidance of the USFWS into the FEIS was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the Administrative Procedure Act, 5 U.S.C. § 706.

177.     As a direct result of Defendants failure to engage in formal consultation and incorporate the results of that consultation into the FEIS and ROD, Plaintiffs will suffer immediate and actual harm.

178.    In particular, the sale of Plum Island as proposed by Defendants will foreclose the ability of Plaintiffs and others to purchase all or part of Plum Island for conservation purposes or to otherwise conserve the land and natural resources and adversely affect and irreparably harm the Plaintiffs and their respective members' aesthetic, conservation, recreational, economic, scientific, informational, and procedural interests.

### SIXTH CAUSE OF ACTION

**Violation of NEPA, APA, and Failure to Use Analysis of Cooperating Agencies**

179.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 131 as if fully set forth herein.

180.    NEPA requires that lead agencies "use the environmental analysis and proposals of cooperating agencies with jurisdiction by law of special expertise, to the maximum extent possible consistent with its responsibility as lead agency."  40 C.F.R. § 1501.6(a)(2).

181.    Both the EPA and the USFWS acted as a cooperating agencies in the preparation of the EIS.

182.    Notwithstanding the EPA's and USFWS' role as cooperating agencies, Defendants ignored their repeated comments that the DEIS and FEIS were deficient.

183.    Defendants ignored the EPA's environmental analysis and proposal that Defendants consider a conservation ordinance, mitigating conservation options, and specifically detail their plans to clean up contamination associated with the PIADC.

184.    Defendants ignored the USFWS' environmental analysis and proposal that Defendants include a conservation-oriented, public ownership option.

185.     In ignoring its consultation requirements under the ESA, Defendants violated NEPA's requirement that it use the EPA's and USFWS,' as cooperating agencies, environmental analysis and proposals "to the maximum extent possible." *Id*.

186.     Defendants failure to rely on the expertise of their cooperating agencies as required by Section 7 of the ESA, and failure to incorporate the guidance of the EPA and USFWS into the FEIS was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the Administrative Procedure Act, 5 U.S.C. § 706.

187.     As a direct result of Defendants failure to cooperate with the EPA and USFWS, Plaintiffs will suffer immediate and actual harm.

188.     In particular, the sale of Plum Island as proposed by Defendants will foreclose the ability of Plaintiffs and others to purchase all or part of Plum Island for conservation purposes or to otherwise conserve the land and natural resources and adversely affect and irreparably harm the Plaintiffs and their respective members' aesthetic, conservation, recreational, economic, scientific, informational, and procedural interests.

## SEVENTH CAUSE OF ACTION

### Violation of NEPA, APA, and CZMA for Failure to Perform Consistency Determination

189.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 131 as if fully set forth herein.

190.     Under the CZMA, Federal agencies are required to review any of their activities to ensure that they are undertaken, to the extent possible, in a manner consistent with the enforceable policies of approved state coastal management programs.  *See* 15 CFR § 930.36.

191.     This "consistency determination" must be provided to the relevant state agency "at the earliest practicable time" in the planning or reassessment of an activity.  *Id.*

192.    A consistency determination should be prepared following the development of sufficient information to reasonably determine the consistency of the activity with the management program, but before the Federal agency reaches a significant point of decision making in its review process, i.e., while the Federal agency has the ability to modify the activity. *Id.*

193.    Additionally, "[t]he consistency determination shall be provided to State agencies at least 90 days before final approval of the Federal agency activity unless both the Federal agency and the State agency agree to an alternative notification schedule." 15 C.F.R. § 930.36.

194.    NEPA expressly incorporates this requirement:  "To better integrate environmental impact statements into State or local planning processes, statements shall discuss any inconsistency of a proposed action with any approved State or local plan and laws (whether or not federally sanctioned). Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law." 40 C.F.R. § 1506.2 (d).

195.    Throughout the EIS process, state agencies in both New York and Connecticut raised concerns about consistency with their respective coastal management plans and attempted to provide Defendants with guidance regarding compliance with the CZMA.

196.    Despite repeated comments from CTDEEP and the NYDOS, Defendants approved of the sale of Plum Island without any determination that the sale would be consistent with the coastal zone management programs of either New York or Connecticut.

197.    While the FEIS contemplates that impacts to coastal zones will be evaluated as part of some later federal consistency determination, Defendants fail to provide any timeline for

41

when that determination will take place, except to state that it anticipates providing that determination "as the conveyance of the Property nears."  (June 25, 2013 FEIS, ES-10.)

198.    This prospective hypothetical is contrary not only to the stated direction of the Connecticut and New York implementing agencies, but also to the clear directive of the CZMA that such a determination be made "before the Federal agency reaches a significant point of decisionmaking in its review process, i.e., while the Federal agency has the ability to modify the activity."  *See* 15 CFR § 930.36 (b)(1).

199.    Further, the failure to incorporate any consistency determination violates NEPA's requirement that "[environmental impact] statements shall discuss any inconsistency of a proposed action with any approved State or local plan and laws (whether or not federally sanctioned)."  40 C.F.R. § 1506.2 (d).

200.    Defendants' failure to engage in any consistency determination whatsoever violates the CZMA, NEPA, and Defendants' FEIS is therefore arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the Administrative Procedure Act, 5 U.S.C. § 706.

201.    As a direct result of Defendants failure to engage in a consistency determination, Plaintiffs will suffer immediate and actual harm.

202.    In particular, the sale of Plum Island as proposed by Defendants will foreclose the ability of Plaintiffs and others to participate in the purchase of all or part of Plum Island for conservation purposes or to otherwise conserve the land and natural resources and adversely affect and irreparably harm the Plaintiffs and their respective members' aesthetic, conservation, recreational, economic, scientific, informational, and procedural interests.

## EIGHTH CAUSE OF ACTION

**Violation of NEPA and APA for a final action based on inadequate ecological and environmental cleanup data**

203.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 131 as if fully set forth herein.

204.     Under NEPA, an EIS must also include an analysis on "the environmental impact of the proposed action" and "any adverse environmental effects which cannot be avoided should the proposal be implemented."  See 42 U.S.C.A. § 4332 (C).

205.     Assessing the potential impact of any proposed action on the environment is not possible without comprehensive and current data on the ecology of a proposed action site.

206.     Assessing the potential impact of any proposed action is not possible without the results of consultation under the ESA to determine whether the proposed action may affect a listed species or critical habitat.

207.     Assessing the potential impact of any proposed action is not possible without the results of a consultation under the CZMA to determine whether the proposed action is consistent with state coastal management programs.

208.     Throughout the EIS process, numerous federal and state agencies as well as non-profit organizations requested that Defendants engage in comprehensive surveys of the biology of Plum Island and its surrounding waters.

209.     Further, federal and state agencies repeatedly request that Defendants engage in the consultation required by the ESA and CZMA.

210.     Defendants never engaged in a comprehensive survey of the biology of Plum Island and its surrounding waters.

ny-1212161

211.    Defendants never engaged in the consultation required by the ESA and CZMA.

212.    Because of Defendants' failure to engage in a comprehensive survey of the biology of Plum Island, they could not and did not adequately assess the potential impact of their proposed sale on Plum Island.

213.    Despite the fact that EPA recommended they do so, Defendants failed to specifically and adequately detail their plans to clean up contamination associated with the PIADC.

214.    Defendants' failure to assess the potential environmental impact of the sale violated NEPA and was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of 5 U.S.C § 706.

215.    As a direct result of Defendants failure to assess the potential environmental impact of the sale, Plaintiffs will suffer immediate and actual harm.

216.    In particular, the sale of Plum Island as proposed by Defendants will foreclose the ability of Plaintiffs and others to participate in the purchase of all or part of Plum Island for conservation purposes or to otherwise conserve the land and natural resources and adversely affect and irreparably harm the Plaintiffs and their respective members' aesthetic, conservation, recreational, economic, scientific, informational, and procedural interests.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

217.    Declare that Defendants have violated NEPA by failing to adequately consider alternatives, failing to consider the full environmental effects of the proposed action and related actions, prejudging the final decision, failing to conduct a coastal consistency determination, and failing to base the final decision on adequate environmental analysis;

44

218.    Declare that Defendants' actions pursuant to the Appropriations Act are in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

219.    Enjoin Defendants from completing the FEIS and selling Plum Island until an adequate EIS process has been completed;

220.    Enjoin Defendants from completing the FEIS and selling Plum Island until an appropriate consistency determination has been made consistent with the CZMA;

221.    Award Plaintiffs their reasonable costs and attorneys' fees; and

222.    Grant such other relief as the Court deems just and proper.

ny-1212161

Dated: July 7, 2016

MORRISON & FOERSTER LLP


   s/ Carl H. Loewenson, Jr.

Carl H. Loewenson, Jr.
Christopher J. Carr (motion for admission *pro hac vice* forthcoming)
Joshua A. Roy
Cameron A. Tepfer
250 West 55th Street
New York, NY 10019
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900
cloewenson@mofo.com
ccarr@mofo.com
jroy@mofo.com
ctepfer@mofo.com

CONNECTICUT FUND FOR THE ENVIRONMENT, INC.,
d/b/a SAVE THE SOUND

Roger Reynolds
900 Chapel Street
Upper Mezzanine, Suite 2202
New Haven, CT 06510
Telephone:  (203) 787-0646
Facsimile:  (203) 787-0246
rreynolds@ctenvironment.org

*Attorneys for Plaintiffs*

ny-1212161