UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
CONNECTICUT FUND FOR THE
ENVIRONMENT, INC., d/b/a Save the Sound,
SOUNDKEEPER, INC., PECONIC BAYKEEPER,
GROUP FOR THE EAST END, RUTH ANN
BRAMSON, JOHN POTTER, JOHN TURNER,

       Plaintiff,    **MEMORANDUM AND ORDER**
               2:16-cv-3791 (DRH)(AYS)

 - against -

UNITED STATES GENERAL SERVICE
ADMINISTRATION, UNITED STATES
DEPARTMENT OF HOMELAND SECURITY,
EMILY W. MURPHY,[1] in her official capacity as
Administrator of the U.S. General Services
Administration, KIRSTJEN M. NIELSEN,[2] in her
official capacity as Secretary of the U.S.
Department of Homeland Security,

        Defendant.
---------------------------------------------------------X

**APPEARANCES**

**Morrison & Foerster LLP**
For All Plaintiffs
250 W. 55th Street
New York, NY 10019
By: David A. Manspeizer, Esq.
   Cameron A. Tepfer, Esq.
   Joshua A. Roy, Esq.
   Carl H. Loewenson, Jr., Esq.

---

[1] Substituted for Denise Turner Roth pursuant to Fed. R. Civ. P. 25(d).
[2] Substituted for Jeh Johnson pursuant to Fed. R. Civ. P. 25(d).

**Connecticut Fund-Environment**
For Plaintiff Connecticut Fund for the Environment, Inc.
900 Chapel Street
Upper Mezzanine, Suite 2202
New Haven, CT 06510
By:	Roger Frank Reynolds, Esq.

**United States Attorney's Office for the Eastern District**
For Defendants
271 Cadman Plaza East
Brooklyn, NY 11201
By:	Rukhsanah L. Singh, Esq.

**HURLEY, Senior District Judge:**

## INTRODUCTION

Plaintiffs, Connecticut Fund for the Environment, Inc., doing business as Save The Sound, Soundkeeper, Inc., Peconic Baykeeper, Group For The East End, Ruth Ann Bramson, John Potter, and John Turner (collectively "Plaintiffs") brought this action against the United States General Services Administration, the United States Department of Homeland Security ("DHS"), Emily Murphy, in her official capacity as Administrator of the U.S. General Services Administration, and Kirstjen M. Nielsen, in her official capacity as Secretary of the DHS (collectively "Defendants").  Plaintiffs challenge Defendants' failure to comply with the requirements of the National Environmental Policy Act ("NEPA") in preparing an Environmental Impact Statement ("EIS") related to Defendants' proposed sale of Plum Island.

Presently before the Court is Defendants' motion to dismiss under Fed. R. Civ. P ("Rule") 12(b)(1) for lack of subject matter jurisdiction.  For the reasons explained below, Defendants' motion is denied in its entirety.

## BACKGROUND

The following relevant facts are taken from the Parties' papers and the Complaint.

I. **Plum Island**

Plum Island is an 840-acre island off the coast of Southold in Long Island, New York. (Compl. [DE 1] ¶ 1.) Plum Island has been owned and operated by the Federal Government since 1826, originally as an army fort. (*Id.*) In 1954, Plum Island was transferred to the U.S. Department of Agriculture ("USDA") to establish a research facility for foot-and-mouth disease. (*Id.* ¶ 39.) In 2003, the Island was transferred to the DHS, but USDA continues to use the Plum Island Animal Disease Center ("PIADC") for research. (*Id.*)

The total developed and maintained area of Plum Island consists of 170 acres, which includes 35 acres associated with the PIADC (including transportation facilities such as ferry docking and other support facilities) and 30 acres for the former Fort Terry. (*Id.* ¶ 40.) Access to Plum Island has and continues to be limited due to the nature of the research conducted at the PIADC. (*Id.* ¶ 41.) As a result of limited human interference Plum Island is a unique ecological resource with a largely undeveloped habitat for migratory birds, mammals, and other endangered species.[3] (*Id.*)

Plum Island provides habitat for several federally endangered and threatened flora and fauna species. (*Id.* ¶¶ 49–56.) Among the federally-listed bird species that can be found on the Island are the Roseate Tern and the Piping Plover. (*Id.* ¶ 51.) Federally listed plant species on the Island include the sandplain gerardia, seabeach knotweed, seabeach amaranth, and small whorled pogonia. (*Id.* ¶ 50.) There are also federally listed marine species that have been identified in the waters surrounding Plum Island, including Atlantic hawksbill sea turtles, Kemp's Ridley sea

---

[3] Plum Island's unique ecological resources has been attested to by Plaintiffs and by numerous members of the government. For example, the four senators from New York and Connecticut co-sponsored a bill in August 2017 called the Plum Island Conservation Act for the purpose of protecting the Island as a habitat. *See* S. 1675, 114th Cong. (2017).

turtles, Atlantic Sturgeon, and others.  (*Id.* ¶ 53.)  Additionally, several New York State threatened species are present on the island.  (*Id.* ¶ 52.)  Finally, Plum Island is home to the largest "seal haul-out area in southern New England."  (*Id.* ¶ 56.)

## II. The Appropriations Act and the Subsequent Environmental Review

On September 30, 2008, the President signed the "Consolidated Security, Disaster Assistance and Continuing Appropriations Act" of 2008 (the "2008 Appropriations Act").  This Act, among other directives, provided that

> [S]hould the Secretary of Homeland Security determine that the National Bio and Agro-defense Facility be located at a site other than Plum Island, New York, the Secretary shall liquidate the Plum Island Asset by directing the Administrator of General Services to sell through public sale all real and related personal property and transportation assets which support Plum Island operations, subject to such terms and conditions as necessary to protect government interests and meet program requirements[.]

Pub. L. No. 110-329, § 540, 122 Stat. 3574, 3688 (2008).  The proceeds from the sale of Plum Island and the PIADC are to be used to purchase a new site and construct the National Bio and Agro-defense Facility (the "Facility").  *Id.*  This intent was again reiterated in the Consolidated Appropriations Act, 2012 (the "2012 Appropriations Act"), which states that:

> Notwithstanding any other provision of law during fiscal year 2012 or any subsequent fiscal year, if the Secretary of Homeland Security determines that the National Bio- and Agro-defense Facility should be located at a site other than Plum Island, New York, the Secretary shall ensure that the Administrator of General Services sells through public sale all real and related personal property and transportation assets which support Plum Island operations, subject to such terms and conditions as may be necessary to protect Government interests and meet program requirements.

Pub. L. No. 112-74 § 538(a).  The 2012 Appropriations Act also requires that the "proceeds of such sale . . . shall be deposited as offsetting collections" into a designated account "and, subject to appropriation shall be available . . . for site acquisition, construction, and costs related to the construction of the [new Facility]." *Id.* at § 538(b).  In the time since the 2008

4

Appropriations Act, there have been several attempts to repeal the law. *See, e.g,* Plum Island Conservation Act, S. 1675, 114th Cong. (2017).

In January 2009, the DHS made a determination that the PIADC should be closed and its activities moved to a new location. (Singh Decl. Ex. 3 (January 16, 2009 ROD) at 3065.) As such, Defendants began the environmental review process pursuant to NEPA. (*Id.*) In May 2010, Defendants held the required public scoping meetings regarding the scope of the EIS. (Compl. ¶ 72.) Numerous governmental entities offered comments during the scoping period, including the U.S. Environmental Protection Agency ("EPA"), U.S. Fish and Wildlife Service ("FWS"), and the Connecticut Department of Energy and Environmental Protection. (*Id.* ¶ 73.) On July 20, 2012, Defendants, as joint lead agencies, issued the Draft EIS ("DEIS"). (*Id.* ¶ 87.) Defendants then held two public meetings regarding the DEIS on October 17 and 18, 2012. (Singh Decl. Ex. 5 (FEIS) at 1-8.) The DEIS received a total of 119 comments. (*Id.* at H-1.)

On June 25, 2013, Defendants issued the Final EIS ("FEIS"). (Compl. ¶ 107.) In response to the FEIS, Defendants received additional comments from state and federal agencies. (*Id.* ¶¶ 111–121.) For example, the EPA sent a letter stating that the FEIS had not considered "an ordinance that would create a conservation area that would limit development and preserve much of the island" and did not "offer mitigation options as EPA recommended in our comment letter on the DEIS." (*Id.* ¶ 116.)

On August 29, 2013, Defendants issued a Record of Decision ("ROD"). (*Id.* ¶ 122.) The ROD states that Defendants have "proposed to transfer Plum Island, New York and its support facilities out of federal ownership by way of public sale. This Record of Decision (ROD) documents the decision to proceed with that process." (Singh Decl. Ex. 6 (August 29, 2013 ROD) at 1.) The conclusion to the ROD states the following:

> Having given consideration to all of the factors discovered and analyzed during the NEPA process, it is the Joint Lead Agencies' decision to proceed with the Proposed Action. When the time frame for the DHS relocation from PIADC to NBAF [the Facility] in Kansas is known, the Joint Lead Agencies will re-examine the EIS specifically for the purpose of ensuring that it reflects the then current knowledge of the conditions on the property, versus those conditions that existed on the date of this ROD, and will supplement the EIS as necessary.

(*Id.* at 5.)

On July 7, 2016, Plaintiffs brought this action claiming that the EIS violates NEPA, the Appropriations Act, and the Administrative Procedure Act ("APA"). (Compl. at 1.) In their Complaint, Plaintiffs seek declaratory relief and ask the Court to enjoin Defendants from completing the environmental review process and selling Plum Island until an adequate EIS has been completed. (*Id.* ¶¶ 217–22.) Defendants filed the instant motion to dismiss for lack of subject matter jurisdiction on March 16, 2017.

## LEGAL STANDARD

A case may properly be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) "when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.2000). "In contrast to the standard for a motion to dismiss for failure to state a claim under Rule 12(b)(6), a 'plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists.'" *MacPherson v. State St. Bank & Trust Co.*, 452 F. Supp. 2d 133, 136 (E.D.N.Y. 2006) (quoting *Reserve Solutions Inc. v. Vernaglia*, 438 F. Supp. 2d 280, 286 (S.D.N.Y. 2006)), *aff'd*, 273 F. App'x 61 (2d Cir. 2008); *accord Tomaino v. United States*, 2010 WL 1005896, at *1 (E.D.N.Y. Mar. 16, 2010). "In resolving a motion to dismiss for lack of subject matter jurisdiction, the Court may consider affidavits and other materials beyond the pleadings to resolve jurisdictional

questions." *Cunningham v. Bank of New York Mellon, N.A.*, 2015 WL 4101839, * 1 (E.D.N.Y. July 8, 2015) (citing *Morrison v. Nat'l Australia Bank, Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008)).

A Rule 12(b)(1) motion is the proper vehicle for a claim that an issue is unripe. *See Benincasa v. N.Y. Dep't for Envtl. Conservation*, 85 Fed. App'x 244, 245 (2d Cir. 2004); *New York v. U.S. Army Corps of Engineers*, 896 F. Supp. 2d 180, 196 (E.D.N.Y. 2012).

## DISCUSSION

### I. Parties' Contentions

Defendants advance three arguments in support of their motion to dismiss: (1) Plaintiffs' claims are not constitutionally or statutorily ripe for review because Defendants have not concluded their review under NEPA, the Endangered Species Act ("ESA"), or the Coastal Zone Management Act ("CZMA"); (2) Plaintiffs fail to allege an imminent injury-in-fact; and (3) the Court should decline to exercise jurisdiction pursuant to the doctrine of prudential mootness. Plaintiffs oppose the Motion to Dismiss as to all three grounds, arguing that their claims are ripe for review as the FEIS and ROD constituted final agency action, that they have alleged an injury-in-fact, and that declining to exercise jurisdiction would be inappropriate.

The Court addresses each of these arguments in turn, below.

### II. NEPA

Prior to addressing the Parties' contentions it is useful to review the requirements under NEPA.

NEPA mandates that federal agencies must consider the environmental impact of any major federal action "significantly affecting the quality of the human environment." *Balt. Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 103 S.Ct. 2246, 2247 (1983). To meet this mandate, agencies must "take a 'hard look' at the environmental consequences before taking a

major action." *Id.* To do this, federal agencies prepare an EIS "to provide full and fair discussion of significant environmental impacts and [to] inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." *Natural Resources Defense Council, Inc. v. F.A.A.*, 564 F.3d 549, 556 (2d Cir. 2009) (quoting 40 C.F.R. § 1502.1). The EIS must examine: (1) the environmental impact of the action; (2) any adverse environmental impacts that cannot be avoided if the action is implemented as proposed; (3) alternatives to the proposed action; (4) the relationship between "local short-term uses of the environment and the maintenance and enhancement of long-term productivity;" and (5) any "irreversible and irretrievable commitments of resources that would be involved in the proposed actions should it be implemented." *Natural Resources Def. Council, Inc. v. U.S. Army Corps of Engineers*, 399 F. Supp. 2d 386, 397–98 (S.D.N.Y. 2005) (citing *Robertson Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989)).

NEPA is a "procedural statute that mandates a process rather than a particular result." *Stewart Park and Reserve Coalition Inc. v. Slater*, 352 F.3d 545, 557 (2d Cir. 2003) (citing *Sierra Club v. U.S. Army Corps of Eng'rs*, 701 F.2d 1011, 1029 (2d Cir. 1983)). As the Second Circuit has explained, "NEPA does not command an agency to favor any particular course of action, but rather requires the agency to withhold its decision to proceed with an action until it has taken a 'hard look' at the environmental consequences." *Stewart Park*, 352 F.3d at 557.; *see also Theodore Roosevelt Conservation Partnership v. Salazar*, 616 F.3d 497, 504 (D.C. Cir. 2010) (citing *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 558 (1978) ("It is an 'essentially procedural' statute, meant to ensure 'a fully informed and well-considered decision, not necessarily' the best decision.").

Under NEPA, an agency's "discussion of 'alternatives to the proposed action,' 42 U.S.C. § 4332(2)(C)(iii), forms the heart of the environmental impact statement." *Natural Resources Defense Council, Inc. v. FAA*, 563 F.3d at 556. In the EIS, an agency must "rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." *Id.* (quoting 42 U.S.C. § 1502.14(a)); *see also Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (2d Cir. 1991) ("[Council on Environmental quality] regulations oblige agencies to discuss only alternatives that are feasible, or (much the same thing) reasonable."). An agency satisfies its duty under NEPA by "[r]igorously explor[ing] and objectively evaluat[ing] all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss[ing] the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a); *see also Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 195 (D.C.Cir.1991) ("If . . . the consideration of alternatives is to inform both the public and the agency decisionmaker, the discussion must be moored to some notion of feasibility.") (internal quotation marks and footnote omitted).

NEPA itself does not provide for judicial review of federal actions so plaintiffs bring NEPA challenges under the APA. *Brodsky v. U.S. Nuclear Regulatory Comm'n*, 704 F.3d 113, 118 (2d Cir. 2013). "Pursuant to the APA, courts review contested agency action to determine if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A). This is a highly deferential standard, but it "does not equate to no review." *Brodsky*, 704 F.3d at 113 (citing *Wilson v. CIA*, 586 F.3d 171, 185 (2d Cir. 2009).

Having described NEPA's requirements, the Court will now address the issues of ripeness, injury-in-fact, prudential mootness, and standing under the ESA and the CZMA.

**III.     Ripeness**

    A. General Principles – Legal Standard

Article III of the U.S. Constitution requires that all cases or controversies be ripe for judicial review. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300. To determine whether a case is ripe for review, a Court is generally required to "evaluate both the fitness of the issue for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner,* 387 U.S. 136, 148 (1967)).

In *Ohio Forestry Ass'n, Inc. v. Sierra Club*, the Supreme Court articulated a three-part test for determining whether an agency's decision is ripe for judicial review. 523 U.S. 726, 737 (1998). Specifically, a court must consider: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Id.* Notably, this test was laid out in the context of analyzing a challenge to a land resource management plan. By contrast, the Supreme Court discussed ripeness for NEPA purposes, explaining that forest plans are unlike EIS's because environmental review under NEPA will never get riper. *Id.* at 727. While this language suggests that the *Ohio Forestry* test may not apply to NEPA claims, courts in the Eastern District have previously noted that it is difficult to believe that "the Supreme Court would intend to attempt to abrogate its prudential ripeness case law as to NEPA claims in a few sentences of dicta." *New York v. U.S. Army Corps of Engineers*, 896 F. Supp. 2d at 196.

On the other hand, in *Ohio Forestry* the Supreme Court stated that "a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that

10

failure at the time the failure takes place, for the claim can never get riper." *Ohio Forestry*, 523 U.S. at 737. Moreover, other courts in the Second Circuit have held that "where the allegation is that an agency's final NEPA documentation fails to comply with NEPA procedure, there is no doubt that the agency's determination is ripe for judicial review." *Natural Resources Defense Council, Inc. V. U.S. Army Corp of Engineers*, 457 F. Supp. 2d 198, 216 (S.D.N.Y. 2006) (citing *Greene County Planning Bd. V. Federal Power Comm'n.*, 490 F.2d 256, 258 (2d Cir. 1973) (rejecting as not yet ripe a challenge to an EIS that had not been finalized by the lead agency's order)).

Defendants and Plaintiffs disagree over whether the *Ohio Forestry* test applies to a NEPA claim. Defendants contend that the test does apply, and that Plaintiffs' claims should be dismissed as unripe under each of the test's three elements. (Mem. in Supp. at 25.) Plaintiffs argue that the test does not apply to procedural harms under NEPA, but that even under *Ohio Forestry* test their claims are ripe for review. (Mem. in Opp. at 14 n. 3.) This Court declines to resolve the apparent confusion regarding whether the *Ohio Forestry* test controls or if final NEPA documentation is ripe for judicial review by its very nature. Rather, the Court assumes the *Ohio Forestry* factors apply, and finds that Plaintiffs' claims are ripe.

### B. The Motion to Dismiss on Ripeness Grounds is Denied

Defendants claim that the Court lacks subject matter jurisdiction because there has been no finality to Defendants' action as they "have not concluded their review, and any potential sale is years away and subject to multiple conditions precedent." (Mem. in Support [DE 33] at 2–3.) Plaintiffs counter that Defendants violated NEPA in numerous ways and that "[e]ach and every one of these well-pleaded violations occurred the moment that Defendants issued their flawed FEIS and ROD." (Mem. in Opp. [DE 34] at 17.)

Under the first *Ohio Forestry* factor, withholding consideration at this time could cause significant hardship to Plaintiffs as they may not have another opportunity to seek appropriately robust environmental review. For example, Defendants cannot point to any specific section of the ROD or FEIS where they have committed to undertaking further review of alternatives. Even if Defendants do supplement their environmental review in the future, they have stated that they will do so to "ensure that [their review] reflects the then current knowledge of the conditions on the property, versus those conditions that existed on the date of this ROD[.]" (Singh Decl. Ex. 6 (August 29, 2013 ROD) at 5.) The FEIS echoes this language by stating that:

> [T]he Joint Lead Agencies may have to supplement the EIS when the timing of the sale becomes clearer . . . [at which time] the Joint Lead Agencies will be able to re-examine what further work should be done to *bring it up to date* to ensure that the federal government meets its responsibilities[.]

(Singh Decl. Ex. 5 (FEIS) at ES-12, 2-1) (emphasis added).) Neither of these statements, nor anything else in the record, indicate that Defendants will conduct further analysis of alternatives, and the alternatives analysis is at the heart of NEPA review.

Furthermore, Defendants issued a ROD setting forth their decision to proceed with a public sale of the entirety of Plum Island even though they concede that supplemental review will be required. The ROD does not state that Defendants will review their decision to proceed with the sale based on the results of that supplemental review, which suggests that any future review will be limited in scope and that the decision to sell may be a fait accompli. Withholding consideration could harm Plaintiffs through the ramifications of Defendants' alleged failure to conduct appropriately thorough environmental review, which does not appear likely to be remedied by supplemental environmental review of changed conditions on the property. Therefore, the first element is met.

Under the second *Ohio Forestry* factor, there is no reason for the Court to believe that judicial intervention would inappropriately interfere with further administrative action. As discussed directly above, the FEIS and ROD are final environmental documents and there is little likelihood based on the facts presented that the limited scope of proposed future environmental review will overcome all of the alleged shortcomings of the FEIS. Additionally, even if Defendants were to undertake supplemental review at some uncertain time in the future, an interim robust analysis of alternatives, for example, would have no negative impact on the future environmental review.

Under the final *Ohio Forestry* factor, there is nothing in the record to suggest that there would be a benefit to awaiting further factual development of the issues presented. Defendants have issued an FEIS and a ROD setting out their decision. Based on the language in these documents quoted above, it does not seem that any supplemental environmental review prior to the sale of Plum Island will be sufficiently robust or include additional analysis of alternatives. Notably, Defendants never state in their moving papers that they will consider additional alternatives at any time in the future. Rather, they state that "the ROD at issue here does not expressly exclude the option of revisiting the alternatives considered[.]" (Reply Mem. in Further Supp. [DE 35] at 8.) This language does not establish any kind of commitment, or even likelihood, that Defendants will revisit the alternatives section or review alternatives they have not yet considered. Therefore, the Court sees no reason to wait for further factual development.

As such, Plaintiffs meet the *Ohio Forestry* test for ripeness. However, even if they had not met this test, there is sufficient logic to the dicta in *Ohio Forestry* stating that a NEPA claim can never be riper than at the time of the procedural failure. Defendants expended a significant amount of ink trying to distinguish an FEIS from a final agency decision for purposes of judicial

review. However, this Court is not convinced by the hair-splitting. In the case Defendants cite, the Second Circuit found that a challenge to a draft EIS—for which an FEIS had been prepared and made available but for which there was no ROD—was not ripe. *Greene*, 490 F.2d at 258. Here, Defendants have issued an FEIS and a ROD. The ROD repeatedly sets out Defendants' decision to proceed with the sale of Plum Island, irrespective of the result of future environmental review. The ROD's mentions of supplemental environmental review at some unknown future date does not negate the finality of these agency actions.

For all of these reasons, Defendants' motion to dismiss on the basis that Plaintiffs' claims are not ripe for review is rejected as unconvincing.

## IV. Injury-in-Fact

### A. General Principles – Legal Standard

Article III of the Constitution requires that a plaintiff demonstrate that he has standing to bring an action by showing that there is: "1) an injury-in-fact, that is an actual or imminent, and concrete and particularized, invasion of some legally protect[ed] interest of the plaintiffs; 2) a fairly traceable causal connection between the actions of the defendants and the injury-in-fact; and 3) a likelihood that a favorable decision will redress plaintiffs complained-of injury." *New York v. U.S. Army Corp of Engineers*, 896 F. Supp. 2d at 189 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. at 560–61). A plaintiff can demonstrate standing to enforce a procedural right, such as under NEPA, "without meeting all the normal standards for redressability and immediacy." *Id.* In the NEPA context, plaintiffs can demonstrate standing by showing that they use and intend to continue to use the environment in question for "fishing, camping, swimming, and bird watching[.]" *New York v. U.S. Army Corp of Engineers*, 896 F. Supp. 2d at 189 (citing *Friends of the Earth, Inc. v. Laidlaw Envt'l Svcs.*, 528 U.S. 167, 181–84 (2000)).

The Supreme Court has acknowledged that "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. at 563–63 (citing *Sierra Club v. Morton*, 405 U.S. 727, 734 (1972)). However, the injury-in-fact test "requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Id.* In NEPA cases, plaintiffs usually demonstrate that they are "among the injured" by submitting affidavits testifying to their use of the environment at issue. This requirement is fairly stringent; for example, the Supreme Court has previously held that plaintiffs lacked standing when their affidavits only alleged that they used land in the "vicinity" of the specific tract of land at issue. *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 903 (1990).

An association has standing to sue on behalf of one or more of its members if the members "would otherwise have standing to sue on their own right, the interests at stake are germane to the organization's purpose, and . . . the claim asserted [does not] require[] the participation of individual members in the lawsuit." *Friends of the Earth, Inc.*, 528 U.S. at 181.

B. The Motion to Dismiss for Lack of an Injury-in-Fact is Denied

Defendants argue that Plaintiffs lack standing to assert their claims because there is no imminent injury-in-fact as Defendants "have not determined the exact method of public sale, nor do they know who will purchase the property or if that purchase will limit any one's access to Plum Island and the Orient Point Facility." (Mem. in Support at 30.) Defendants also state that Plaintiffs lack standing because a "favorable judicial decision here will not 'prevent or redress' the [alleged] injury.'" (*Id.* at 31 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).) Finally, Defendants note that Plaintiffs do not have an ongoing right of access to Plum Island and that "Plum Island is not a public property held in trust for the people pursuant to the

Federal Land Policy and Management Act of 1976." (Mem. in Opp. at 31.) While Defendants do not specifically argue that this lack of public access undermines Plaintiffs' standing, they do state that any admittance to Plum Island has been solely at the discretion of the DHS. (*Id.*)

Plaintiffs respond that they have the required connection to the area of concern because each Plaintiff and their members "live, work, and recreate in the communities and waters surrounding Plum Island." (Mem. in Opp. at 27 (quoting *Ocean Advocates v. U.S. Army Corp of Engineers*, 402 F.3d 846, 859–60).) Plaintiffs claim that they or their members sail, boat, bird-watch, marine-life watch, and otherwise study and enjoy the environment on and around Plum Island. (Mem. in Opp. at 28.) For example, Plaintiff Ruth Ann Bramson organizes community tours of the Island, during which she and her tour groups "observe and appreciate the wildlife and woodlands of Plum Island." (Compl. ¶ 16.) Likewise, Plaintiff John Potter "spends a significant amount of time fishing in the waters surrounding Plum Island," and Plaintiff John Turner birds and "enjoys observing the hundreds of harbor and gray seals" on the Island. (*Id.* ¶¶ 17–18.) Ms. Bramson, Mr. Potter, and Mr. Turner are all members of Plaintiff Save the Sound. (*Id.* ¶¶ 16–18.)

As explained above, a plaintiff can demonstrate standing to enforce a procedural right under NEPA "without meeting all the normal standards for redressability[4] and immediacy" and by showing that they use and intend to continue to use the environment in question for "fishing, camping, swimming, and bird watching[.]" *New York v. U.S. Army Corp of Engineers*, 896 F. Supp. 2d at 189 (citing *Friends of the Earth*, 528 U.S. at 181–84). For purposes of this motion to

---

[4] Even if Plaintiffs were required to demonstrate redressability they would meet that burden. Plaintiffs are claiming a procedural injury insomuch as Defendants failed to conduct appropriate environmental review under NEPA. A favorable judicial decision would redress the injury by requiring Defendants to conduct such review.

dismiss, Plaintiffs have met that burden by alleging that their members have used and will continue to use the Plum Island environment for bird-watching, animal-watching, etc. The prospect of injury to Plaintiffs' direct aesthetic and recreational interests in the Plum Island environment is sufficient to plead an injury-in-fact under NEPA. The fact that Plaintiffs have no ongoing right to access Plum Island does not impede their ability to bird-watch or animal-watch on the Island, to boat along the coast of the Island, to fish in the Island's waters, to enjoy the scenic vista of the Island from the land or surrounding sea, or to traverse the Island itself with permission for the foregoing purposes as Plaintiff Bramson has done numerous times.

Finally, it is inconsequential that Defendants "have not yet determined the exact method of public sale" or that "Plaintiffs are free to purchase the property, if it is publicly sold." (Mem. in Opp. at 30.) Plaintiffs are seeking to enforce a procedural right, namely, the requisite thorough environmental review under NEPA. Thus, the injury-in-fact does not stem from how Defendants will sell the Island or who buys the Island, but rather from Defendants' alleged failure to comply with the proper procedure. Such alleged injury occurred at the time the FEIS and ROD were issued. The proposed future environmental review is unlikely to remedy this injury because Defendants, by their own language, have only made the commitment to supplement the FEIS and ROD as is necessary to update the documents to reflect the then-current environmental conditions. Therefore, Defendants' motion to dismiss for failure to allege an imminent injury-in-fact is denied.

## V.     Prudential Mootness

Defendants' final argument is that even if the Court finds that it has subject matter jurisdiction over Plaintiffs' claims, the Court should decline to exercise its jurisdiction pursuant

to the doctrine of prudential mootness "to permit the agencies the opportunity to conclude their administrative process under NEPA, the ESA, and the CZMA." (Mem. in Support at 32.)

The "'[p]rudential mootness doctrine often makes it appearance in cases where a plaintiff starts off with a vital complaint but then a coordinate branch of government steps in to promise the relief she seeks.'" *Kurtz v. Kimberly-Clark Corporation*, 321 F.R.D. 482 (E.D.N.Y. 2017) (quoting *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1210 (10th Cir. 2012)). Here, no other branch of government can step in to promise Plaintiffs the relief they seek by way of the requisite environmental review under NEPA because Defendants are the lead agencies. Thus, the Court is not swayed that it would be appropriate to invoke the prudential mootness doctrine here.

Moreover, the single case that Defendants cite in which a district court dismissed NEPA claims under this doctrine is easily distinguished. In *Los Alamos Study Grp. v. U.S. Dep't of Energy*, the lead agencies were in the process of supplementing their EIS with a Supplemental EIS ("SEIS") that would *supersede* the original EIS being challenged. 794 F. Supp. 2d 1216, 1222–23 (D.N.M. 2011), *aff'd*, 692 F.3d 1057 (10th Cir. 2012). It easy to understand in that situation why the Court exercised its discretion to find that plaintiffs' standing to challenge the soon-to-be superseded EIS was prudentially moot. That is not the case here, where Defendants have issued a ROD setting out their decision and are not in the process of conducting supplemental environmental review or issuing an SEIS that will supersede the FEIS. The ROD's references to future environmental review at the time of the sale/transfer of Plum Island does not render the current FEIS and ROD interlocutory. In fact, there is no indication whatsoever that any future environmental review would supersede the allegedly insufficient sections of the

current FEIS. Therefore, the Court rejects Defendants' request that it decline to exercise jurisdiction pursuant to the doctrine of prudential mootness.

## VI. ESA and CZMA

As a final note, the Court acknowledges Defendants' argument that Plaintiffs also lack standing to bring claims under the ESA and the CZMA. In reviewing the Complaint, none of the eight causes of action allege a violation of the ESA independent of NEPA, the Appropriations Act, and/or the APA. While the seventh cause of action does allege a violation of NEPA, the APA, *and* the CZMA for failure to perform a consistency determination, Plaintiffs then go on to specify that NEPA expressly incorporates this requirement. (Complaint at ¶ 194; *see also* Mem. in Opp at 21 n.6.) Plaintiffs also clarified in a letter to the Court dated October 27, 2016, that they "do not allege a stand-alone violation of the CZMA." (*See Mem. in Support* at 13 n. 7 (citing Oct. 27, 2016 Letter in Response to Defendants' Letter at 3.) Therefore, there is no need for the Court to analyze whether it has subject matter jurisdiction over standalone claims under the ESA and the CZMA.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is denied.

**SO ORDERED.**

Dated: Central Islip, New York
January 11, 2018

/s/
Denis R. Hurley
Unites States District Judge